IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 21, 2016

## STATE OF TENNESSEE v. ANTONIO TERRELL PEWITTE

**Appeal from the Criminal Court for Davidson County**
**No. 2014-A-511      J. Randall Wyatt, Jr., Judge**

**No. M2015-02103-CCA-R3-CD – Filed November 14, 2016**

I join the majority in affirming Defendant's conviction of child neglect. However, I write separately because I conclude that the trial court erred by allowing Ms. Donnell to testify about statements made to her by the victim and the victim's mother.

The majority concludes that the trial court did not err because the statements were admissible under Tennessee Rule of Evidence 803(4), the hearsay exception for statements made for the purpose of medical diagnosis and treatment. The Rule provides the exception for "[statements] made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment." The Advisory Commission Comments for Rule 803(4) clarify that such statements "must be for both diagnosis and treatment." Our supreme court has explained that "if physicians or other medical personnel rely upon the statement in diagnosing and treating the patient, then the statement should be sufficiently trustworthy to be admissible in a court of law." State v. McLeod, 937 S.W.2d 867, 870 (Tenn. 1996).

At trial, Ms. Donnell testified that she had been trained "in the specific field of Child Abuse Pediatrics" and that she was a member of the Child Abuse Response and Evaluation (CARE) team at Vanderbilt. She stated that "when a child presents to our hospital with injuries or concerns for neglect or abuse the treating team will ask for our consultation. We evaluate the child directly." She said the CARE team's evaluation of the child differed from the treating team's evaluation in that "we go into greater detail in terms of asking about the specifics of the injury." She then stated as follows:

> [W]e also examine the child and photo document any injuries
> that the child might have and then we order specific tests that

might be helpful in, uh, that might be helpful in obtaining more information about other injuries that the child might have, so other labs or other x-rays that might be necessary and <u>we put all of that information together and formulate an opinion about the child's injuries whether we think it is consistent with abuse or neglect or an accidental mechanism or medical condition</u>.

(Emphasis added.)

Ms. Donnell testified that she spoke with the victim about 3:30 p.m. on December 2 in the hospital's emergency department and that she asked how the victim had hurt her hands. The victim told Ms. Donnell that Defendant "'put them under hot water'" and that he was angry because she "didn't hurry up and wash [her] hands.'" Ms. Donnell acknowledged that the victim also described being placed in a corner as a form of discipline. Ms. Donnell said that in addition to talking with the victim and the victim's mother, she examined the victim "from head to toe looking for any other signs of other injuries she might have had." The victim's hands already had been wrapped in bandages when Ms. Donnell evaluated her, and Ms. Donnell did not unwrap or "manipulate her hands in any way" so as not to cause the victim additional pain. Ms. Donnell said she used photographs taken of the victim's hands on December 2 to "formulate[] her opinion," and she testified about the victim's burns and the burn patterns caused by the flowing water. The State asked if she requested that the victim reenact the event, and she answered, "The purpose of my evaluation is strictly medical. It has an investigative value, but we are not investigators and so I wouldn't want to further traumatize her by asking her to re-enact that in the emergency department setting." At the conclusion of her testimony, the State asked if she had formulated an opinion as to whether the victim's burns were accidental, and she said that the victim's injuries were consistent with a person having held the victim's hands in hot water but that she could not determine the person's intent.

On cross-examination, Ms. Donnell testified that she could not be "100 percent certain" that the victim's injuries were abusive in nature but that "based on the history provided and the injuries of the child . . . , it is clear that these were inflicted." Ms. Donnell acknowledged that according to the victim's medical records, the victim told someone on December 2 that Defendant did not mean to hurt her. Defense counsel asked Ms. Donnell if the victim's statement affected her opinion as to Defendant's intent, and Ms. Donnell answered, "So <u>when I evaluate for abuse</u> I am looking at the history that is provided along with the injuries to see if they are consistent with that history and I would not comment other than to say that I might be concerned about intentionality, but I couldn't be definitive about that." (Emphasis added.) She acknowledged writing in her

report that she was "extremely concerned" that the victim's hands had been placed in hot water intentionally and that DCS and law enforcement should interview the victim's brother in order to help determine whether "'this may have been abusive in nature.'" On redirect examination, Ms. Donnell again stated that she was "a medical provider," not an investigator.

At the conclusion of Ms. Donnell's testimony, the jury left the courtroom, and defense counsel requested to question Ms. Donnell further. In an offer of proof, defense counsel asked Ms. Donnell, "[W]ould it change your opinion if you learned that [the victim's brother] also stated that [Defendant] didn't mean to and that he is really sad about what happened, would that change your opinion?" Ms. Donnell said no, and the following exchange occurred:

> Q. So even though your report includes a section that suggests interviewing him [is] necessary for determining whether this is abuse learning that he said that to a medical professional wouldn't change your opinion?

> A. As a medical professional I am very cognizant of not making a diagnosis based on intent, that is not my role as a medical provider, so as I have said over and over is that I take the history, combine with the injuries and whether or not that is consistent with abusive or accidental injury, but . . . intent it is nothing that I can evaluate as a medical provider, while that information is extremely valuable for the investigative process in determining overall finding of abuse or neglect in a legal setting that is not something that I can say as a medical provider.

> Q. But and maybe I had it wrong when you testified in front of the jury, my understanding is what you were offering was an opinion that this must have been abuse or neglect?

> A. It was inflicted.

> Q. Inflicted?

> A. Yes.

> Q. Which means something different to you?

- 3 -

A. It means that a force acted on her by somebody else and, you know, that is, it is what it is, and I haven't said that this is definitively abuse.

Q. Thank you.

. . . .

THE COURT: And the word "inflicted", what does that mean to you?

THE WITNESS: It means that somebody, that another person has inflicted and it has caused an injury to another individual in this case, a child, so the child would not have had this injury if the other person had not acted upon the child.

In concluding that the statements were admissible, the majority opinion notes that "Ms. Donnell testified that she was conducting a medical evaluation not an investigation." However, Ms. Donnell's testimony demonstrates that she was well-aware of the language necessary to distinguish statements made for the purpose of medical diagnosis and treatment from statements made for the purpose of evaluating child abuse and that she attempted to tailor her testimony accordingly.

Such language is not dispositive, though. Ms. Donnell testified that her evaluation of the victim was "strictly medical" but offered no testimony as to how she medically treated or diagnosed the victim regarding the victim's burns. She also offered no testimony as to how she medically treated or diagnosed the victim for any emotional or psychological injury. To me, her testimony shows that she was asked to evaluate the victim, after the victim already had been treated by another physician in the emergency room, for the sole purpose of determining whether the victim's burns were accidentally or intentionally inflicted and not for the purpose of medical diagnosis and treatment. Therefore, I believe the victim's and her mother's statements to Ms. Donnell were inadmissible.

Nevertheless, I also believe that the trial court's error in allowing the statements into evidence was harmless. Ms. Donnell testified that the victim said Defendant was angry and put her hands under the hot water and that Mother said Defendant dipped a needle in rubbing alcohol, began popping the blisters, and wanted to apply itch and burn cream to the burns. The victim and Mother gave similar testimony at trial. Moreover, the victim's statement that Defendant did not mean to hurt her, introduced through Ms.

Donnell's testimony, was actually helpful to Defendant, and the jury acquitted him of both counts of aggravated child abuse and one count of aggravated child neglect. In my view, the jury's lone guilty verdict was based more on Defendant's refusal to seek medical treatment for the victim despite the obvious seriousness of her burns than it was on Defendant's placing the victim's hands under the hot water. Mother's trial testimony was particularly damaging in this regard. Thus, I think the error was harmless beyond a reasonable doubt.

_____
NORMA MCGEE OGLE, JUDGE